IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KALIM A.R. MUHAMMAD, etc.,     )
     )
     **Plaintiff,**     )
     )
**v.**     )    **CIVIL ACTION 11-0690-WS-B**
     )
**BRENDA BETHEL-MUHAMMAD, et al.,**)
     )
     **Defendants.**     )

## ORDER

This matter is before the Court on a motion to dismiss filed by defendant Robert E. Armstrong.  (Doc. 57).  The parties have filed briefs in support of their respective positions, (Docs. 58, 65), and the motion is ripe for resolution.  After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

This is the pro se plaintiff's second lawsuit covering essentially the same subject matter.  The first[1] was dismissed without prejudice due to the plaintiff's prolonged failure to present a comprehensible complaint compliant with basic pleading requirements, a ruling upheld on appeal.  (Docs. 20, 35 and attachments).  The plaintiff commenced this action with a 100-page complaint, which fell further beyond the outer bound of permissible pleadings than any in his original action and which prompted the Court to order an amended complaint.  (Doc. 20).  The plaintiff responded with a 30-page, 25-count amended complaint.  (Doc. 37).  It is this document – the sixth iteration of the

---

[1] *Muhammad v. Bethel*, Civil Action No.10-0086-WS-B ("*Muhammad I*").

complaint over the course of two lawsuits – that is the target of the instant motion to dismiss.

The defendants are:  (1) Brenda Bethel-Muhammad; (2) Lajenna Hatcher; (3) Dallas County Department of Human Resources ("Dallas DHR"); (4) Alabama Department of Human Resources ("State DHR"); (5) Armstrong; (6) Paul Vaughan Russell; (7) Equifax Credit Reporting Agency ("Equifax"); and (8) Experian Credit Reporting Agency ("Experian").  In general, the amended complaint alleges that the plaintiff and Bethel entered an agreement purporting to require that any disputes regarding their minor daughter be resolved outside of court.  Bethel, represented by Russell, nevertheless filed custody and child support actions in state court, presided over by Armstrong.  Hatcher, a DHR employee, assisted Bethel.  Experian and Equifax (collectively, "the Credit defendants") disseminated negative information from the DHR defendants and/or the court file.

The counts, and the defendants under each, are as follows:

| 1  | Section 1981 and First Amendment          | Bethel, Russell, Hatcher       |
|----|-------------------------------------------|--------------------------------|
| 2  | Fourteenth Amendment Due Process          | All                            |
| 3  | Fourth Amendment Right to Privacy         | All non-Credit defendants      |
| 4  | Fifth Amendment Due Process/              | All non-Credit defendants      |
|    | Federal Arbitration Act                   |                                |
| 5  | 42 U.S.C. § 2000a-2                        | All non-Credit defendants      |
| 6  | 18 U.S.C. § 241                           | All                            |
| 7  | 18 U.S.C. § 242                           | All non-Credit defendants      |
| 8  | 42 U.S.C. § 2000bb-1                       | All non-Credit defendants      |
| 9  | 42 U.S.C. § 1985(2), (3)                  | All individual defendants      |
| 10 | 18 U.S.C. § 1341                          | All                            |
| 11 | 42 U.S.C. § 1986                          | All but State and Dallas DHR   |
| 12 | Article 1, Section 10, 14th Amendment     | All non-Credit defendants      |
| 13 | 18 U.S.C. § 1512(c)(1), (2)               | All                            |

[2]

| 14 | 42 U.S.C. § 2000a | All non-Credit defendants |
|----|-------------------|---------------------------|
| 15 | 40 U.S.C. § 122 | Armstrong |
| 16 | 42 U.S.C. § 1994 | Armstrong |
| 17 | 42 U.S.C. §§ 1985(2), (3), 1986, | All but Russell and Armstrong |
|    | 5 U.S.C. § 556(d) | |
| 18 | Ninth Amendment, 42 U.S.C. § 2000d | All non-Credit defendants |
| 19 | Fifth Amendment, Fourteenth Amendment, | All |
|    | 42 U.S.C. §§ 1982, 1983 | |
| 20 | Article 1, Section 10, 18 U.S.C. § 1001 | All |
| 21 | 18 U.S.C. §§ 1512(d), 1514, | |
|    | 42 U.S.C. §§ 1985(3), 1986 | All |
| 22 | Ala. Code § 12-16-217, | All non-Credit defendants |
|    | 42 U.S.C. §§ 1983, 1985, 1986 | |
| 23 | Canon 1, Alabama Judicial Code of Conduct | All non-Credit defendants |
| 24 | Canon 2, Alabama Judicial Code of Conduct | All non-Credit defendants |
| 25 | Fair Credit Reporting Act | All |

Judge Armstrong is thus a defendant under all counts except One and Seventeen.

## DISCUSSION

Judge Armstrong's motion to dismiss raises numerous grounds, which the Court addresses in turn.

### A. Judicial Immunity.

Judicial immunity is an affirmative defense. *Sibley v. Lando*, 437 F.3d 1067, 1070 n.2 (11th Cir. 2005); *Harper v. Merckle*, 638 F.2d 848, 855 n.8 (5th Cir. 1981); *Boyd v. Carroll*, 624 F.2d 730, 732-33 (5th Cir. 1980). "[A] party who has asserted an affirmative defense has the burden of proving the affirmative defense." *BMI Salvage Corp. v. Federal Aviation Administration*, 272 Fed. Appx. 842, 852 (11th Cir. 2008). Thus, "as the

[3]

proponent of the claim of absolute judicial immunity, Judge [Armstrong] bears the burden of establishing that such immunity is warranted." *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004).

"Judges are entitled to absolute judicial immunity from damages for those acts taken while they are acting in their judicial capacity unless they acted in the 'clear absence of all jurisdiction.'" *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000) (quoting *Stump v. Sparkman*, 435 U.S. 349, 356-357 (1978)). "This immunity applies even when the judge's acts are in error, malicious, or were in excess of his or her jurisdiction." *Id.*[2]

"Whether a judge's actions were made while acting in his judicial capacity depends on whether: (1) the act complained of constituted a normal judicial function; (2) the events occurred in the judge's chambers or in open court; (3) the controversy involved a case pending before the judge; and (4) the confrontation arose immediately out of a visit to the judge in his or her judicial capacity." *E.g., Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005). With respect to every act of Judge Armstrong alleged in the amended complaint, it is obvious that he was acting in a judicial capacity under this test.

The amended complaint alleges that Judge Armstrong was "in charge" of the state cases until replaced by Judge Pettway earlier this year. (Doc. 37 at 5, 13). Judge Armstrong "failed to give us voice for any appeal of any of his decisions and failed to heed our constitutional issues, as well as failed to make an adequate record of what was

---

[2] At least five policy reasons underlie this broad grant of immunity. They include the need for judges to "be free to act upon [their] own convictions, without apprehension of personal consequences"; the likelihood "that the losing party may be overly willing to ascribe malevolent motives to the judge"; the prospect that judges facing the threat of lawsuits by disappointed litigants "would be driven to wasteful and destructive self-protection devices and, moreover, may be less inclined to administer justice"; the recognition that alternate remedies such as appeal and impeachment "reduce the need for private rights of action against judges"; and the aversion to "constantly … forc[ing] [judges] to defend their motivations in court." *Dykes v. Hosemann*, 776 F.2d 942, 949 (11th Cir. 1985) (en banc). The plaintiff makes plain his distaste for judicial immunity, but he cannot alter either the rule or the policy reasons undergirding it.

said in the court." (*Id*. at 13). After recusing himself, Judge Armstrong came back on the case "without warning and without any proper notification to us of Judicial Ethics oversight or approval of his doing so." (*Id*.). Judge Armstrong for two years "subjected [the plaintiff] to abuse of process by not giving hearing to our motions, not trying the facts and giving weight to our evidence." (*Id*. at 5). Judge Armstrong "fail[ed] to insure the making of a true and adequate record and making expeditious rulings on motions that announced our infringing of Constitutional rights." (*Id*. at 6). Judge Armstrong "sent out an arrest warrant and altered the custody rights of the Plaintiff(s)." (*Id*.). Judge Armstrong engaged in "ex parte talks" with Russell. (*Id*. at 7). Judge Armstrong sat "to oversee the custody and contractual rights of the Plaintiff(s), but knowing full well that a motion for continuance was issued to the Court and all concerned, as well as the fact that we were all under the expectations of a new judge." (*Id*. at 7). "On or about January 5, 2011, Mr. Armstrong [and other defendants] showed up to the Dallas County Court … to conclude a plan to punish us for bringing on litigation in the Federal Courts against them." (*Id*. at 16). Judge Armstrong never "tried to prevent Miss Bethel from making this stupendous claim of so called 'back pay' for a year back." (*Id*. at 17). "Mr. Armstrong has continued to fight us in bringing forth evidence to refute Miss Bethel's claim, by being the gate keeper to stop our evidence from ever being discovered." (*Id*. at 18). Judge Armstrong "also made a comment that the Plaintiff (in proper) had enough children and should just leave the daughter in question to the custody of Miss Bethel." (*Id*. at 18). After being sued by the plaintiff in this Court, Judge Armstrong "started making threats to pay sums of money that we had contested that we did not owe." (*Id*.). "The Judge never once gave us proper jurisdiction quotes and neither did he pen this to the record for us to use." (*Id*. at 19). On January 5, 2011, Judge Armstrong made "a legal pronouncement to take away the custody rights and to insure that [the plaintiff] was put in jail, so that he would not bother the Defendants." (*Id*.). Judge Armstrong "then recue [sic] himself again – within days." (*Id*.). Judge Armstrong "stripped away our rights and leaves no record for his proper jurisdiction of why he is to sit back on a case."

[5]

(*Id.* at 21).   Judge Armstrong "tried to insure that we be guided into the State arena, in spite of Federal claims, knowing he had the best opportunity to kill any and almost every legal assertion."  (*Id.* at 22).   Judge Armstrong "under friendly alliance 'concealed' and tampered with the evidence because we were prosecuting him in federal court and we believe he wanted us to be under his scrutiny in only the Dallas County Court."  (*Id.* at 23).

The plaintiff, in short, complains of the way Judge Armstrong handled the cases pending before him, while he was engaged in normal judicial functions and conducting himself in open court or in chambers.   He was thus acting in his judicial capacity for purposes of immunity analysis.   Even if Judge Armstrong in some particular "egregiously erred," he would not thereby lose his resulting immunity.   *Scott*, 719 F.2d at 1567.   Even if he acted "malicious[ly]," his immunity would remain intact.   *Bolin*, 225 F.3d at 1239.   Even if he "conspired with [another] party to violate [the plaintiff's] constitutional rights," he would be immune.   *Dykes v. Hosemann*, 776 F.2d 942, 946 (11ᵗʰ Cir. 1985) (en banc) (internal quotes omitted).

Judge Armstrong is thus entitled to judicial immunity unless he acted "in the clear absence of all jurisdiction."   *Bolin*, 225 F.3d at 1239.   The relevant jurisdiction is "jurisdiction over the subject matter."   *Stump*, 435 U.S. at 357; *accord Dykes*, 746 F.2d at 943 ("We … reassert the common law doctrine that a judge enjoys absolute immunity where he or she had subject matter jurisdiction over the matter forming the basis for such liability.").[3]   Immunity is lost only by an utter, obvious lack of jurisdiction; if jurisdiction existed and Judge Armstrong merely exceeded that jurisdiction, he remains immune.   *Id.*

---

[3] The plaintiff relies on the panel opinion in *Dykes* for the proposition that an absence of personal jurisdiction is enough to defeat judicial immunity.  (Doc. 55 at 10).  The en banc opinion in *Dykes*, which controls, held exactly the opposite.  776 F.2d at 943, 949-50.

Indeed, even if subject matter jurisdiction was actually lacking but the jurisdictional question is colorable, his immunity is unbroken.[4]

Subject matter jurisdiction turns on the authority provided the judge by statute or other proper governmental dispensation.  So long as state law provides him subject matter jurisdiction to hear a case of the sort entertained (or, more precisely, so long as state law does not clearly rule out such jurisdiction), then for purposes of immunity a judge does not act in the clear absence of all jurisdiction.  *E.g., Stump*, 435 U.S. at 357-59 (where statute provided the defendant judge jurisdiction to hear "all cases in law and equity whatsoever," he had subject matter jurisdiction over a juvenile sterilization petition, even though state and federal law might prohibit such sterilization); *Scott*, 719 F.2d at 1566-67 (where Alabama statutes granted circuit judges jurisdiction to hear "all civil cases" generally and divorce cases in particular, subject matter jurisdiction existed even though the judge "egregiously erred" in suggesting a vasectomy in exchange for a favorable property settlement).

Judge Armstrong is district court judge of Dallas County, sitting as juvenile judge as Alabama law permits.  Ala. Code §§ 12-12-34, 12-15-103(a).  The cases involved child custody and support – subjects that countless Alabama cases confirm lie properly within the subject matter jurisdiction of juvenile judges.  The plaintiff does not suggest otherwise.

Instead, the plaintiff argues that Judge Armstrong lacked jurisdiction because the plaintiff's arbitration agreement with Bethel prohibited resort to the court system.[5]  A

---

[4] *E.g., Hughes v. Long*, 242 F.3d 121, 125 (3rd Cir. 2001); *Ireland v. Tunis*, 113 F.3d 1435, 1444 (6th Cir. 1997); *Snell v. Tunnell*, 920 F.2d 673, 686 (10th Cir. 1990); *Crooks v. Maynard*, 913 F.2d 699, 701 (9th Cir. 1990).  This lenient rule is necessary because judges must determine their own jurisdiction in the first instance, and even the best will sometimes wrongly conclude that jurisdiction exists – a legal error that should not expose the judge to personal liability.  Thus, "[b]ecause some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, … the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge."  *Stump*, 435 U.S. at 356.

private agreement that disputes be resolved outside the judicial system does not deprive a judicial officer of subject matter jurisdiction he would otherwise possess, even when the agreement is valid and enforceable.[6]  In particular, an agreement to arbitrate a dispute (as the plaintiff terms his contract with Bethel)[7] does not deprive a court of subject matter jurisdiction over the dispute, even though ultimately the court generally will refer the matter to arbitration.  *E.g., Borrero v. United Healthcare, Inc*., 610 F.3d 1296, 1307 (11th Cir. 2010) ("The arbitrability of claims is not jurisdictional, and the district court … would have been competent to hear those claims even though it might have ordered them to arbitration.") (citing First and Seventh Circuit cases).  The plaintiff offers no authority to the contrary.

The plaintiff in brief suggests that "Mr. Armstrong's jurisdiction on the matters of contractual obligations and performance was barred by the 14th Amendment, Art. I Section 10, 42 U.S.C., the Federal Arbitration Act and the down to earth clear and God guided conscious [sic] of the sense of justice and fair play."  (Doc. 65 at 20).  To the extent this statement is intended as more than a repetition of his argument that his arbitration agreement deprived the state court of subject matter jurisdiction, it is rejected as wholly unsupported and wholly insupportable.

---

[5] "[W]e have constantly told the court that it has no jurisdiction of private matters and of religious private matters."  (Doc. 37 at 5 (emphasis omitted)).  "We had argued on many occasions in his Court that we were not under proper jurisdiction, for belief we were entitled to freedom of contract and that the matter of custody had already been precluded by prior agreement."  (*Id*. at 6).

[6] The validity and enforceability of the plaintiff's contract with Bethel appears doubtful. *See, e.g., Bank Independent v. Coats*, 591 So. 2d 56, 60 (Ala. 1991) ("[T]he public policy of this state [is] that parents cannot abrogate their responsibilities to their minor children by mutual agreement between themselves so as to deprive their minor children of the support to which they are legally entitled.") (internal quotes omitted).

[7] (Doc. 37 at 8, 20).

[8]

Because Judge Armstrong acted in his judicial capacity and had subject matter jurisdiction over the state cases, he is entitled as a matter of law to absolute judicial immunity.  The scope of that immunity remains to be determined.

"Our cases have proceeded on the assumption that common-law principles of legislative and judicial immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so."  *Pulliam v. Allen*, 466 U.S. 522, 529 (1984).  Judicial immunity is thus the rule unless and until clearly limited by Congress.[8]

The amended complaint specifies that each of the constitutional claims asserted therein are brought "under the provisions of" Sections 1983, 1985 and 1986.  (Doc. 37 at 4).  Certain of the plaintiff's non-constitutional claims also invoke these provisions.  The Supreme Court has held repeatedly that Section 1983 did not abrogate the common-law doctrine of judicial immunity.  *E.g., Stump*, 435 U.S. at 356; *Pierson v. Ray*, 386 U.S. 547, 554 (1967).  The Eleventh Circuit has confirmed the same with respect to other aspects of the "Civil Rights Acts," including Section 1985(3),[9] and other appellate courts have uniformly ruled the same with respect to Section 1986.[10]  Under these authorities, judicial immunity remains unabrogated as to all of the plaintiff's claims against Judge Armstrong under Counts Two, Three, Nine, Eleven, Twelve,  Twenty and Twenty-One.  It likewise remains unabrogated as to those portions of Counts Four, Eighteen, Nineteen, Twenty-Two and Twenty-Three that invoke these statutes or constitutional provisions being vindicated through them.  Judge Armstrong has not attempted to show that judicial

---

[8] Oddly, the plaintiff inaccurately quotes *Pulliam* for the proposition that there is "no common law immunity."  (Doc. 55 at 10).  The reality is precisely the opposite.

[9] *Scott v. Hayes*, 719 F.2d 1562, 1564 (11th Cir. 1983); a*ccord Hughes v. Long*, 242 F.3d 121, 128 (3rd Cir. 2001); *Mylett v. Mullican*, 992 F.2d 1347, 1352 (5th Cir. 1993).

[10] *Glasspoole v. Albertson*, 491 F.2d 1090, 1091 (8th Cir. 1974); *McDonald v. Lawhorn*, 98 Fed. Appx. 358, 358, 360 (6th Cir. 2004).

immunity remains unabrogated beyond this realm, and the Court will not attempt such a showing on its own.[11]

"[M]onetary damages indisputably are prohibited by judicial immunity." *Pulliam*, 466 U.S. at 543. On the other hand, "[w]e conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id*. at 541.[12] Because the only relief demanded by the amended complaint against Judge Armstrong is an award of damages,[13] judicial immunity provides him a complete shield as to the counts and portions of counts listed above.

### B. Eleventh Amendment Immunity.

States are immune from suit in federal court by virtue of the Eleventh Amendment. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984). A suit against a state officer in his official capacity is effectively one against the state and equally offends the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985). Judge Armstrong is sued in his official capacity as well as in his individual capacity. (Doc. 37 at 2). An Alabama state judge such as Judge Armstrong constitutes a

---

[11] Nor has Judge Armstrong attempted to show that a federal doctrine of judicial immunity operates to protect him from state-law claims.

[12] The rule is apparently contrary in the case of federal judges. *Bolin*, 225 F.3d at 1240-42. Although not an aspect of judicial immunity jurisprudence, by statute even state judges sued under Section 1983 are not susceptible to injunctive relief "unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

[13] The only injunctive relief requested by the amended complaint is to "forbid *the state* to any future intrusion [sic]." (Doc. 37 at 29 (emphasis added)). "The state" is identified as the one "prosecuting" the plaintiff. (*Id*.). The body of the amended complaint alleges that it was Hatcher (the DHR agent) who "intruded." (*Id*. at 8, 14-15). The amended complaint also distinguishes between "the State" on the one hand and "the Dallas County Court" on the other. (*Id*. at 17). As to damages, the amended complaint seeks $500,000 from "each State Defendant party that has a 'personal' capacity" but $3.5 million from "each Defendant party of the State." (*I*d. at 29). All these allegations make plain that "the state" as to which injunctive relief is sought is limited to State DHR and Dallas DHR, to the exclusion of Judge Armstrong.

state officer and partakes of the state's Eleventh Amendment immunity.  *Simmons v. Conger*, 86 F.3d 1080, 1084-85 (11th Cir. 1996).

Eleventh Amendment immunity may in appropriate cases be abrogated by Congress if it unequivocally expresses an intent to do so.  *E.g., Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  "Congress has not abrogated states' immunity from § 1983 suits." *Williams v. Board of Regents*, 477 F.3d 1282, 1301 (11th Cir. 2007).  As noted in Part A, the amended complaint indicates that Section 1983 is invoked only with respect to the plaintiff's claims based on constitutional violations, with statutory claims standing on their own.  (Doc. 37 at 4).  Judge Armstrong has not addressed abrogation other than with respect to Section 1983, and the Court will not do so on his behalf.[14]  Until and unless he effectively does so (or shows that the plaintiff in fact invokes Section 1983 more broadly), the protection of the Eleventh Amendment can be extended no further than is listed in the conclusion to this section.

The Eleventh Amendment precludes an action to the extent it seeks to recover monetary damages, including retroactive monetary damages incident to injunctive relief. *Pennhurst*, 465 U.S. at 102-03.  However, such an action may proceed to the extent the plaintiff seeks appropriate prospective equitable relief.  *Id.*  As noted in Part A, the plaintiff does not seek equitable relief from Judge Armstrong.

In summary, the claims against Judge Armstrong in his official capacity are due to be dismissed on the basis of the Eleventh Amendment as to the following counts and portions of counts.  Completely eliminated are Counts Two, Three and Twelve.

---

[14] It would, for example, be inappropriate to extend to Judge Armstrong the benefit of Eleventh Amendment immunity as to the Title VI claim (Count Eighteen) before he addresses the effect of that statute's provision that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of … title VI of the Civil Rights Act of 1964 ..., or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."  42 U.S.C. § 2000d-7(a)(1).

Eliminated to the extent they invoke Section 1983 or constitutional provisions are Counts Four, Eighteen, Nineteen, Twenty, Twenty-Two and Twenty-Three.

### C.  Qualified Immunity.

Judge Armstrong in his individual capacity asserts the defense of qualified immunity.  (Doc. 58 at 3).  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of the plaintiff's rights; and (2) whether these rights were clearly established at the time of the alleged deprivation.  *Id.*

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law."  *Harbert International*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application."  *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Rich v. Dollar*, 841 F.2d 1558, 1564

(11th Cir. 1988) (internal quotes omitted).  That is, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted).  "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).[15]

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*.

"[A] public official must first *prove* that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (emphasis added, internal quotes omitted).  "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (internal quotes omitted).  The Court must "interpre[t] the evidence in the light most favorable to the plaintiff." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).  The

---

[15] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Harbert*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority. *Id.* (internal quotes omitted). Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof. *Id.* (internal quotes omitted).

Judge Armstrong does not address this critical first element of the qualified immunity analysis other than to posit unhelpfully that his actions "consist entirely of discretionary functions." (Doc. 58 at 3). It is true that, in some cases, the very nature of the job will make it obvious that the defendant acted within his discretionary authority. *See, e.g., Adams v. St. Lucie County Sheriff's Department*, 962 F.2d 1563, 1568 (11th Cir. 1992) ("It is axiomatic that a law enforcement officer has the discretionary authority to pursue and apprehend a fleeing suspected offender."), *vacated on other grounds*, 982 F.2d 472 (11th Cir. 1993). Such clarity obviating further proof is rare, however, and in any event Judge Armstrong provides nothing more than his job title. The Court will not assume that, simply because this defendant is a judge, all his actions were taken within the scope of his discretionary authority as defined above. *See, e.g., Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1079 (S.D. Ala. 2009) ("Chief Collier has offered neither evidence nor argument on this point [discretionary authority], and the Court will not 'fill in the blanks' by formulating his arguments or presenting his proof for him as to this affirmative defense.").

### D.  Pleading Deficiencies.

Judge Armstrong argues that the amended complaint does not satisfy the "heightened pleading" standard applicable to civil rights actions. (Doc. 58 at 4-5). However, "whatever requirements our heightened pleading standard once imposed have

since been replaced by those of the *Twombly-Iqbal* plausibility standard." *Randall v. Scott*, 610 F.3d 701, 707 n.2 (11th Cir. 2010). "After *Iqbal*, it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints." *Id.* at 710.

Without citing either *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), or *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Judge Armstrong laconically asserts that the amended complaint "lacks any specific facts that tend to show" that he violated the plaintiff's rights. (Doc. 58 at 4).

As set forth in orders issued contemporaneously as to other defendants' motions to dismiss, the Court has consolidated in the following numbered paragraphs the isolated factual allegations contained in the amended complaint.[16]

---

[16] The amended complaint purports to "reference … the original of this amended complaint and whatever evidence that can be gleaned from 'Muhammad 1.'" (Doc. 37 at 24; *accord id.* at 21, 23, 25-28). That is, the plaintiff purports to incorporate into his amended complaint the 100-page original complaint that has already been ruled legally improper, *plus* untold pages of "evidence" found not in this lawsuit but in its predecessor. This is legally impermissible.

"A statement in a pleading may be adopted by reference elsewhere … in any other pleading or motion." Fed. R. Civ. P. 10(c). Note that the rule allows "statements" to be adopted, not "pleadings." Courts have routinely required that a pleading invoking incorporation by reference "must specifically identify which portions of the prior pleading are adopted therein." *Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 216 (D. Mass. 1995) (internal quotes omitted); *accord Kolling v. American Power Conversion Corp.*, 347 F.3d 11, 17 (1st Cir. 2003); *Shelter Mutual Insurance Co. v. Public Water Supply District No. 7*, 747 F.2d 1195, 1198 (8th Cir. 1984); *Nycomed, Inc. v. Glenmark Generics Ltd.*, 2010 WL 1257803 at *4 (E.D.N.Y. 2010); *Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 447-48 (E.D. Va. 2009); *In re: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*, 2007 WL 1202544 at *2 n.1 (N.D. Ill. 2007); *Wolfe v. Charter Forest Behavioral Health Systems, Inc.*, 185 F.R.D. 225, 230 (W.D. La. 1999). The plaintiff's sweeping reference to his 100-page complaint represents precisely the "boiler plate 'safety valve,'" *id.*, that other courts – and this one – condemn. *See Park City Water Authority v. North Fork Apartments, L.P.*, 2010 WL 5463814 at *4 n.10 (S.D. Ala. 2010).

The plaintiff's attempt to reference material from *Muhammad I* is likewise foreclosed. *Texas Water Supply Co. v. Reconstruction Finance Corp.*, 204 F.2d 190, 196-97 (5th Cir. 1953) ("Rule 10(c) … permits references to pleadings and exhibits in the same case, but there is no rule (Continued)

1.  The plaintiff had a daughter by Bethel.  In or before 2009, the plaintiff and Bethel entered an agreement calling for "arbitration in a specific forum of religious elders."[17]  The agreement still holds sway because it contains elements of a private trust and the daughter is legal heir to the agreement.  In or about 2009, Bethel nevertheless filed a custody action and later a child support action in state court.  Russell served as her counsel, and Armstrong was the presiding judge.  (Doc. 37 at 8, 13, 17, 22).

2.  In or about April 2010, state agents burst in upon the plaintiff's children at school and questioned them at the instigation of Bethel.  (Doc. 37 at 5, 12).

3.  Hatcher is a DHR employee and assisted Bethel in connection with the two lawsuits, even though she had read the agreement and knew that it prevented resort to the judicial system.  Hatcher is Bethel's first or second cousin, and this created a conflict of interest, but Hatcher agreed with Bethel to proceed in order to help her relative, concealing her conflict in the process.  Bethel and Hatcher agreed not to tell Judge Armstrong about the agreement.  The plaintiff notified Hatcher and various DHR representatives of the agreement and that it precluded the lawsuits, but the DHR

permitting the adoption of a cross-claim in a separate action in a different court by mere reference."); *accord Constellation Energy Commodities Group Inc. v. Transfield ER Capt Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action."); *Hall v. Tyco International Ltd*., 223 F.R.D. 219, 261 (M.D.N.C. 2004). The plaintiff's position is even less tenable, since he purports to reference, not the pleadings in *Muhammad I*, but unidentified "evidence" he submitted therein, and Rule 10(c) permits adoption by reference only of pleadings, not of evidence.

In short, the viability of the plaintiff's action is to be measured by his amended complaint, not by the avalanche of other filings with which he has inexcusably flooded the Court and the litigants over the course of two lawsuits.

[17] The plaintiff, citing his asserted privacy rights, has not submitted the agreement.  (Doc. 37 at 11).

defendants persisted.  The DHR defendants are also aware of Hatcher's conflict of interest.  The DHR defendants acted to protect themselves, due to Hatcher's conflict of interest and fraud.  (Doc. 37 at 8-9, 11-13 19, 22-23).

4.  Russell knew of the arbitration provision because Bethel gave him the agreement, but he concealed the matter of the contract.  In the spring of 2010, Russell engaged in an ex parte conversation with Judge Armstrong.  On or about January 5, 2011, he engaged in another.  (Doc. 37 at 6-7, 12, 23).

5.  Judge Armstrong was made aware of the agreement by the plaintiff, who argued to him on many occasions that the contract precluded his jurisdiction.  However, Judge Armstrong never gave the plaintiff an audience to hear his challenge based on the arbitration agreement, and he never explained how he could exercise jurisdiction in the face of this agreement.  He also failed to make expeditious rulings on the plaintiff's motions asserting violations of his constitutional rights.  Judge Armstrong failed to ensure the making of a true and adequate record (by using a stenographer or making a digital recording).   He also failed to give the plaintiff voice for appeal of any of his decisions.  (Doc. 37 at 6, 12-13, 18-19, 22).

6.  The plaintiff told Hatcher, Russell, Judge Armstrong, and the DHR entities that the agreement was a private matter of religious consequence.   Armstrong was biased against the plaintiff on racial and religious grounds.  (Doc. 37 at 5, 8, 14, 20).

7.  Judge Armstrong was aware he had been sued in *Muhammad I*[18] and thereafter persecuted the plaintiff.   He tried to ensure that the plaintiff be guided into state court, despite his federal claims, knowing he had the best opportunity to kill any legal assertion. He concealed and tampered with evidence because the plaintiff had sued him in *Muhammad I*.  He presided at a hearing in January 2011 in order to make sure the plaintiff was punished for bringing him under federal scrutiny.  (Doc. 37 at 13-14, 22-23).

---

[18] The Court takes judicial notice that *Muhammad I* was filed on February 22, 2010.

8.  After *Muhammad I* was filed, the plaintiff asked Judge Armstrong to recuse himself.  Judge Armstrong later started making threats to pay sums of money, which the plaintiff contested based on his agreement with Bethel.  (Doc. 37 at 18-19).

9.  Bethel claimed the plaintiff owed her thousands of dollars in "back pay," which the plaintiff protested.  This and/or other demands for payment were adverse to the terms of the private agreement.  Russell, Hatcher and Judge Armstrong did not try to prevent Bethel from making this claim.  The plaintiff announced he had audio and video evidence to refute Bethel's claim, but Judge Armstrong fought the plaintiff's efforts to bring this evidence to light.  (Doc. 37 at 5, 17-18).

10.  On and prior to January 5, 2011, the plaintiff objected to Judge Armstrong placing custody of the daughter with Bethel.  The plaintiff noted that he already had two minor daughters in his household.  Judge Armstrong commented that the plaintiff had enough children already and another might be too much.  (Doc. 37 at 18, 23-24).

11.  A hearing was set for January 5, 2011.  The plaintiff filed a motion for continuance, but it was not ruled on.  On or about the same date, Russell engaged in a second ex parte conversation with Judge Armstrong.  At the hearing, Judge Armstrong took away the plaintiff's custody rights and sent out an arrest warrant for the plaintiff.  Bethel, Hatcher and Russell agreed to this action.  This was the conclusion of a plan by the non-Credit defendants to punish the plaintiff for bringing *Muhammad I*.  (Doc. 37 at 6-7, 16, 19).

12.  Judge Armstrong had recused himself but came back to preside at the January 2011 hearing and then recused himself again days later, never explaining why he was again sitting on the case.  (Doc. 37 at 6, 7, 13, 19, 21).

13.  The plaintiff was detained at some point under a false emergency of Bethel and Russell.  He was later held on grounds of child support, which was spurious in light of the arbitration agreement.  (Doc. 37 at 17).

14.  Since approximately early 2011, the plaintiff has been bombarded with threat letters asking for payments the plaintiff believes he does not owe the state or Bethel.

[18]

Since approximately early 2010, the plaintiff has been subjected to countless summonses and threats of imprisonment by the state court. At some point, Hatcher ushered the plaintiff before Judge Armstrong, under threat of jail for contempt, to sign documents for change of custody status and child support. (Doc. 37 at 5, 15).

15. The plaintiff was previously in fear of being thrown in jail. Now, the DHR defendants collect private documents, have the plaintiff report to them, and come to the plaintiff's home under court order to validate that he and his daughters have a decent house in which to live. (Doc. 37 at 15).

16. The Credit defendants disseminated erroneous information received from the state defendants and/or court records. In or about July 2011, the plaintiff sent the Credit defendants cease-and-desist letters and warned them that they were negligent in failing to clean up fraudulent information in his file received from the state and/or court records. The Credit defendants had been previously warned that the information was fraudulent and had been told that Trans Union had eliminated the adverse data after learning the matter was in dispute in federal court for fraudulent attachments. The plaintiff provided the Credit defendants with federal court documents. The Credit defendants did not cease and desist. The Credit defendants were actively and passively involved in the fraud concerning Bethel's back pay claim. They lacked the will to clear the plaintiff's name of fraudulent attachment. As a result of the Credit defendants' conduct, the plaintiff has experienced difficulty securing business and personal loans and has lost business. (Doc. 37 at 10, 14, 18, 22, 28).

17. In August or September 2011, the plaintiff showed up at a hearing in state court to vent his constitutional claims, but the DHR defendants' lawyer made clear they were not going to show up. These defendants have repeatedly refused to state their position on the constitutional issues. (Doc. 37 at 9).

18. In or about November 2011, Russell saw the plaintiff in court and gave him a blood-curdling stare. In or about November 2011, Russell recanted his legal representation of Bethel. (Doc. 37 at 11, 12, 19).

[19]

19. Judge Pettway has been appointed to take Judge Armstrong's place.  She conducted a hearing on February 2, 2012.  (Doc. 37 at 5, 9).

20. The plaintiff believes that the defendants conspired.   The initial basis of the conspiracy was that Bethel and Hatcher are cousins.  The conspiracy is evidenced at least by Russell's two ex parte conversations with Judge Armstrong.  (Doc. 37 at 6-7, 17).

21. The individual defendants had the ability to abort violations of the plaintiff's rights but lacked the will to do so.  They acted based on nepotism, family and friendly alliances, and religious hegemony.  (Doc. 37 at 21).

22. All the defendants have attacked the plaintiff's property rights and personal financial accounts and creditworthiness by taking property from various accounts.  Damages include loss of custody, impairment of contract, attachment of wages, attachment of accounts, credit downgrade, loss of capital, loss of business, and emotional distress.  None of the defendants have apologized for their behaviors.  (Doc. 37 at 12-13, 19, 22).

In order to obtain dismissal on the ground asserted, Judge Armstrong would need to compare the allegations against him to the legal requirements of each cause of action alleged against him and show that the facts alleged do not state a claim for relief that is plausible on its face.  Perhaps he could do so, but he has not made the effort, and the Court will not do battle on his behalf.

**E.  Other Arguments.**

Without further amplification, Judge Armstrong asserts that the Court "lacks jurisdiction to hear the Plaintiff's complaint."  With similar brevity, he states that "the doctrines of res judicata, collateral estoppel and the statute of limitations bar the Plaintiff's complaint."  (Doc. 58 at 1-2).  Announcing a conclusion does not constitute the raising of an argument, much less the development and defense of one.  The Court

will not construct or support arguments on Judge Armstrong's behalf, and one-liners like those he offers here support no prayer for dismissal.

## CONCLUSION

For the reasons set forth above, Judge Armstrong's motion to dismiss is **granted in part**. Counts Two, Three, Nine, Eleven and Twelve as to Judge Armstrong are **dismissed with prejudice** pursuant to judicial immunity. Counts Four, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two and Twenty-Three as to Judge Armstrong, to the extent brought pursuant to Section 1983, 1985 or 1986 rather than pursuant to the other provisions referenced therein, are **dismissed with prejudice** pursuant to judicial immunity. Counts Two, Three and Twelve, and those portions of Counts Four, Eighteen, Nineteen, Twenty, Twenty-Two and Twenty-Three invoking a constitutional provision or Section 1983, to the extent asserted against Judge Armstrong in his official capacity, are also **dismissed** pursuant to the Eleventh Amendment. In all other respects, Judge Armstrong's motion to dismiss is **denied**.

DONE and ORDERED this 21st day of May, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE