IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KALIM A.R. MUHAMMAD, etc.,      )
                                )
        Plaintiff,              )
                                )
v.                              )      CIVIL ACTION 11-0690-WS-B
                                )
BRENDA BETHEL-MUHAMMAD, et al.,)
                                )
        Defendants.             )

**ORDER**

This matter is before the Court on two motions to dismiss. (Docs. 39, 46). One was filed by defendants Dallas County Department of Human Resources ("Dallas DHR"), Alabama Department of Human Resources ("State DHR"), and Lajenna Hatcher (collectively, "the DHR defendants"), the other by Paul Vaughan Russell. The parties have filed briefs in support of their respective positions, (Docs. 40, 47, 55, 56, 65), and the motions are ripe for resolution. After careful consideration, the Court concludes that Russell's motion is due to be denied and that the DHR defendants' motion is due to be granted in part and denied in part.

**BACKGROUND**

This is the pro se plaintiff's second lawsuit covering essentially the same subject matter. The first[1] was dismissed without prejudice due to the plaintiff's prolonged failure to present a comprehensible complaint compliant with basic pleading requirements, a ruling upheld on appeal. (Docs. 20, 35 & Attachments). The plaintiff commenced this action with a 100-page complaint, (Doc. 1), which fell further beyond the outer bound of

---

[1] *Muhammad v. Bethel*, Civil Action No. 10-0086-WS-B ("*Muhammad I*").

[1]

permissible pleadings than any in his original action and which prompted the Court to order an amended complaint.  (Doc. 20).  The plaintiff responded with a 30-page, 25-count amended complaint.  (Doc. 37).  It is this document – the sixth iteration of the complaint over the course of two lawsuits – that is the target of the instant motions to dismiss.

The defendants are:  (1) Brenda Bethel-Muhammad; (2) Hatcher; (3) Dallas DHR; (4) State DHR; (5) Russell; (6) Robert E. Armstrong; (7) Equifax Credit Reporting Agency ("Equifax"); and (8) Experian Credit Reporting Agency ("Experian").[2]  In general, the amended complaint alleges that the plaintiff and Bethel entered an agreement purporting to require that any disputes regarding their minor daughter be resolved outside of court.  Bethel, represented by Russell, nevertheless filed custody and child support actions in state court, presided over by Armstrong.  Hatcher, a DHR employee, assisted Bethel.  Experian and Equifax (collectively, "the Credit defendants") disseminated negative information from the DHR defendants and/or the court file.

The counts, and the defendants under each, are as follows:

| 1 | Section 1981 and First Amendment | Bethel, Russell, Hatcher |
|---|---|---|
| 2 | Fourteenth Amendment Due Process | All |
| 3 | Fourth Amendment Right to Privacy | All non-Credit defendants |
| 4 | Fifth Amendment Due Process/ Federal Arbitration Act | All non-Credit defendants |
| 5 | 42 U.S.C. § 2000a-2 | All non-Credit defendants |

---

[2] Although the DHR defendants appear to believe otherwise, (Doc. 40, passim), Attorney General Luther Strange is not a party to this lawsuit.  Neither his name nor his title appears in the style of the original and amended complaints.  *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties …").  The body of the amended complaint simply identifies him as "counsel of correspondence for State Parties," (Doc. 37 at 3), and thereafter ignores him.  That the "petition for relief" seeks an apology from the Attorney General for the conduct of others and a promise to guard against "future attacks on the citizens," (*id*. at 30), does not make him a party to these proceedings.  The plaintiff concedes that Strange is not a party.  (Doc. 65 at 10-11).

| | | |
|---|---|---|
| 6 | 18 U.S.C. § 241 | All |
| 7 | 18 U.S.C. § 242 | All non-Credit defendants |
| 8 | 42 U.S.C. § 2000bb-1 | All non-Credit defendants |
| 9 | 42 U.S.C. § 1985(2), (3) | All individual defendants |
| 10 | 18 U.S.C. § 1341 | All |
| 11 | 42 U.S.C. § 1986 | All but State and Dallas DHR |
| 12 | Article 1, Section 10, 14th Amendment | All non-Credit defendants |
| 13 | 18 U.S.C. § 1512(c)(1), (2) | All |
| 14 | 42 U.S.C. § 2000a | All non-Credit defendants |
| 15 | 40 U.S.C. § 122 | Armstrong |
| 16 | 42 U.S.C. § 1994 | Armstrong |
| 17 | 42 U.S.C. § § 1985(2), (3), 1986, 5 U.S.C. § 556(d) | All but Russell and Armstrong |
| 18 | Ninth Amendment, 42 U.S.C. § 2000d | All non-Credit defendants |
| 19 | Fifth  Amendment, Fourteenth Amendment, 42 U.S.C. § § 1982, 1983 | All |
| 20 | Article 1, Section 10, 18 U.S.C. § 1001 | All |
| 21 | 18 U.S.C. §§ 1512(d), 1514, 42 U.S.C. §§ 1985(3), 1986 | All |
| 22 | Ala. Code § 12-16-217, 42 U.S.C. § § 1983, 1985, 1986 | All non-Credit defendants |
| 23 | Canon 1, Alabama Judicial Code of Conduct | All non-Credit defendants |
| 24 | Canon 2, Alabama Judicial Code of  Conduct | All non-Credit defendants |
| 25 | Fair Credit Reporting Act | All |

**DISCUSSION**

[3]

The Court considers the movants' arguments in turn.  A recurrent theme, as the following discussion reveals, is the movants' failure to address their arguments in detail adequate to permit a favorable ruling.

### A.  Eleventh Amendment.

States are immune from suit in federal court by virtue of the Eleventh Amendment.  Such immunity extends to entities having a sufficiently close connection to the state that a suit against the entity is effectively one against the state itself.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984).  The DHR defendants invoke this immunity.  (Doc. 40 at 5-9).

Whether an entity other than the state itself partakes of the state's Eleventh Amendment immunity depends on whether it is an "arm of the state."  *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977).  "Whether [a defendant] is an arm of the state protected by the Eleventh Amendment turns on its function and character as determined by state law.  ... Factors that bear on this determination include the definition of 'state' and 'political subdivision,' the state's degree of control over the entity, and the fiscal autonomy of the entity."  *Fouche v. Jekyll Island - State Park Authority*, 713 F.2d 1518, 1520 (11th Cir. 1983). A fourth factor, sometimes subsumed within the "fiscal autonomy" factor, is "who is responsible for judgments against the entity."  *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.,* 734 F.2d 730, 732 (11th Cir. 1984).  "[T]he most important factor is how the entity has been treated by the state courts."  *Versiglio v. Board of Dental Examiners*, 651 F.3d 1272, 1273 (11th Cir. 2011) (internal quotes omitted).  Because Alabama courts extend state sovereign immunity only to arms of the state, and because they evaluate that status in a manner similar to that obtaining under the Eleventh Amendment, their judgment as to whether an entity is an arm of the state under state law is important to Eleventh Amendment analysis.  *Id*. at 1276-77.

[4]

The amended complaint essentially concedes that State DHR and Dallas DHR are arms of the state protected by the Eleventh Amendment. The amended complaint describes State DHR, Dallas DHR and Hatcher as "the State and Agents of the State" and, collectively, as "[t]he State Defendants." (Doc. 37 at 12, 19). The plaintiff explicitly admits that he "has caused the State of Alabama to be a Defendant." (Doc. 55 at 9).

Even apart from the plaintiff's concessions, the record reflects that State DHR and Dallas DHR are arms of the state. Both were created by the Alabama Legislature, Ala. Code §§ 38-2-1, -8, and both partake of sovereign immunity under state law. *Ex parte Alabama Department of Human Resources*, 999 So. 2d 891, 896 (Ala. 2008) (State DHR); *Ex parte Trawick*, 959 So. 2d 51, 55-56 (Ala. 2006) (county DHR); *State Department of Human Resources v. Bussman*, 69 So. 3d 895, 897 n.3 (Ala. Civ. App. 2011) (both). Moreover, a number of federal courts have determined that Alabama state and county DHRs are protected by the Eleventh Amendment.[3] The Court likewise concludes that State DHR and Dallas DHR are shielded by the Eleventh Amendment.

A suit against a state officer in his or her official capacity is effectively one against the state and equally offends the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985). Hatcher is sued in her official capacity as well as in her individual capacity, and the amended complaint affirmatively insists that she is a state agent. (Doc. 37 at 2). The suit against Hatcher in her official capacity thus falls within the Eleventh Amendment.

---

[3] *E.g., Thomas v. Buckner*, 2011 WL 4071948 at *6 (M.D. Ala. 2011) (Watkins, C.J.); *Ford v. Child Support DHR*, 2010 WL 2305305 at *1 (M.D. Ala. 2010) (Moorer, M.J.); *Ziegler v. Alabama Department of Human Resources*, 710 F. Supp. 2d 1229, 1249 (M.D. Ala. 2010) (Albritton, J.); *Danzy v. State of Alabama*, 2010 WL 1994902 at *1 (S.D. Ala. 2010) (DuBose, J.); *Johnson-Price v. Alabama Department of Human Resources*, 2010 WL 1268095 at *4 (M.D. Ala. 2010) (Thompson, J.); *Mack v. Alabama Department of Human Resources*, 201 F. Supp. 2d 1196, 1207 (M.D. Ala. 2002) (DeMent, J.); *Liedel v. Juvenile Court*, 707 F. Supp. 486, 487, 492 (N.D. Ala. 1989) (Haltom, J.).

Eleventh Amendment immunity may in appropriate cases be abrogated by Congress if it unequivocally expresses an intent to do so.  *E.g., Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  "Congress has not abrogated states' immunity from § 1983 suits." *Williams v. Board of Regents*, 477 F.3d 1282, 1301 (11th Cir. 2007).  The DHR defendants assert that the amended complaint says it is brought under Section 1983, (Doc. 40 at 8), so that their immunity dodges the abrogation bullet.  But what the amended complaint actually says is more nuanced:

> The Plaintiff(s) brings this Complaint under the provisions of U.S.C. 42 section 1983, 1985, 1986 for State restrictions and unnecessary limitations or infringement of various Constitutional provisions ….  This complaint also comes under other statutory provisions, such as the Federal Arbitration Act [FAA] and others mentioned and implied or inferred, by the action so accused.

(Doc. 37 at 4).  This statement indicates that Section 1983 is invoked only with respect to the plaintiff's claims based on constitutional violations, with statutory claims standing on their own.[4]  The DHR defendants have not addressed abrogation other than with respect to Section 1983, and the Court will not do so on their behalf.[5]  Until and unless they effectively do so (or show that the plaintiff in fact brings his statutory claims via Section 1983), the protection of the Eleventh Amendment can be extended no further than is listed in the conclusion to this section.

------------------------

[4] It may be that at least some of the plaintiff's statutory claims can be brought, if at all, only through the vehicle of Section 1983.  The plaintiff's failure to invoke Section 1983 as to those claims may subject them to other attacks, but those challenges have not been mounted as yet.

[5] It would, for example, be inappropriate to extend to these defendants the benefit of Eleventh Amendment immunity as to the Title VI claim (Count Eighteen) before they address the effect of that statute's provision that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of … title VI of the Civil Rights Act of 1964 ..., or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."  42 U.S.C. § 2000d-7(a)(1).

[6]

With respect to the DHR defendants, in addition to damages the amended complaint seeks injunctive relief.[6]  The Eleventh Amendment bars equitable relief against the state just as surely as it bars monetary relief.  *Pennhurst*, 465 U.S. at 120 ("[I]f a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting *any* relief on that claim.") (emphasis added); *id.* at 100-01 ("This jurisdictional bar applies regardless of the nature of the relief sought," including "demands for the enforcement of equitable rights and the prosecution of equitable remedies") (internal quotes omitted).  To the extent the Eleventh Amendment applies, it forecloses the plaintiff's ability to receive injunctive relief from State DHR or Dallas DHR.

However, "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment."  *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).  The DHR defendants have advanced no argument why this principle does not apply to Hatcher; again, the Court will not do the defendants' work for them.

In summary, on the limited argument and authority presented, State DHR, Dallas DHR and Hatcher in her official capacity are entitled to Eleventh Amendment immunity with respect to Counts One (to the extent not based on Section 1981),Two, Three, Four (to the extent not based on the FAA), Twelve, Eighteen (to the extent not based on Section 2000d), Nineteen (to the extent not based on Section 1982), Twenty (to the extent not based on 18 U.S.C. § 1001), Twenty-Two (to the extent not based on other federal

---

[6] The plaintiff seeks an order:  (1) "forbid[ding] the state to any future intrusion"; (2) "issu[ing] stern warnings of future recriminations from the State, for prosecuting them in this case"; and (3) requiring "a public apology and a statement from the Attorney General."  (Doc. 37 at 29).

provisions), and Twenty-Three.[7]  With respect to State DHR and Dallas DHR, this immunity extends to both damages and equitable relief; with respect to Hatcher in her official capacity, it extends only to damages.[8]

### B.  Abstention.

The DHR defendants request the Court to abstain under both *Younger* and *Rooker-Feldman*.  (Doc. 40 at 17-20).

"*Younger* abstention" derives from the eponymous case of *Younger v. Harris*, 401 U.S. 37 (1971).  In *Younger*, "the Supreme Court established that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions." *Hughes v. Attorney General*, 377 F.3d 1258, 1262 (11th Cir. 2004) (internal quotes omitted).  But *Younger* abstention is not limited to the criminal context.  Instead, "its principles are 'fully applicable to noncriminal judicial proceedings when important state interests are involved.'"  *31 Foster Children v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003) (quoting *Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 432 (1982)).

Whether *Younger* abstention is appropriate depends on the answers to three questions.  First, "'do [the proceedings] constitute an ongoing state judicial proceeding.'"

---

[7] The latter two counts, though asserting no constitutional violation, explicitly invoke Section 1983.

[8] The DHR defendants note, (Doc. 40 at 16-17), that Section 1983 extends potential liability to certain "persons" and that the Supreme Court has held that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989).  Because it is Section 1983 that creates the remedy, because Section 1983 creates a remedy only in favor of "persons," and because states and their officials in their official capacities are not "persons" within Section 1983, "§ 1983 actions do not lie against a State" or such officials.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997).  However, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 ...."  *Will*, 491 U.S. at 71 n.10.  Thus, this argument fails to extend the DHR defendants' relief beyond that which they have received under the Eleventh Amendment.

Second, "'do the proceedings implicate important state interests.'"  Third, "'is there an adequate opportunity in the state proceedings to raise constitutional challenges.'"  *31 Foster Children*, 329 F.3d at 1274 (quoting *Middlesex*, 457 U.S. at 432).

The state proceedings patently are judicial.  The DHR defendants do not assert that the custody proceedings are ongoing, but they do state that the child support proceedings are ongoing, on the grounds that these defendants are "carrying out the responsibilities of the Department to provide child support enforcement services."  (Doc. 40 at 17).  They do not explain how the action of an administrative agency renders a judicial proceeding ongoing, either in general or for purposes of *Younger* abstention, and the Court will not cast about for authority or rationale to rescue them.

Similarly shallow is the DHR defendants' treatment of the third *Middlesex* requirement, consisting simply of their ipse dixit that the plaintiff "has and continues to have an opportunity to present his federal claims (if he has any) to the state court and the state appellate court."  (Doc. 40 at 19).  The DHR defendants cite no authority to show that a juvenile judge can hear federal constitutional challenges, they ignore the plaintiff's allegations that Judge Armstrong has steadfastly refused – apparently, for years – to entertain his claims, and they do not grapple with what *Middlesex* requires in terms of "adequate opportunity."  Indeed, they do not even attempt to show that it is in the child support proceedings (rather than the custody proceedings) that the plaintiff asserted his federal claims.

As to the second *Middlesex* requirement, the DHR defendants ignore it totally.  However plausible it may be that important state interests are involved, the Court will not perform the defendants' job of collecting the cases and articulating the explanation.

The DHR defendants offer a meager ten-line reference to the *Rooker-Feldman* doctrine without tethering it to this case.  The doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Casale v. Tillman*, 558 F.3d 1258, 1261 (11th Cir. 2009) (internal

[9]

quotes omitted).  Federal courts have no jurisdiction over such cases.  *Brown v. R.J. Reynolds Tobacco Co*., 611 F.3d 1324, 1330 (11th Cir. 2010).  Since the DHR defendants insist that the child support proceedings are ongoing, they presumably mention the doctrine only in connection with the custody proceedings.  But they have failed to show that a state judgment was entered before this suit was launched in December 2011, and they ignore the amended complaint's allegation that Judge Pettway entered an order in February 2012.  They may also have failed to show other elements for proper invocation of the doctrine, but this one is sufficient to require rejection of their position.

　　While it appears plausible that one or perhaps both of these doctrines are properly in play, the DHR defendants' superficial treatment prevents the Court from reaching a definitive conclusion.

### C. Pleading Deficiencies.

　　The DHR defendants argue that the amended complaint does not satisfy the "heightened pleading" standard applicable to civil rights actions.  (Doc. 40 at 10). However, "whatever requirements our heightened pleading standard once imposed have since been replaced by those of the *Twombly-Iqbal* plausibility standard."  *Randall v. Scott*, 610 F.3d 701, 707 n.2 (11th Cir. 2010).  "After *Iqbal*, it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints."  *Id*. at 710.

　　To survive dismissal under Rule 12(b)(6), a complaint must first satisfy the pleading requirements of Rule 8(a)(2).  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief …."  Fed. R. Civ. P. 8(a)(2).  Rule 8 establishes a regime of "notice pleading."  *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 512, 513-14 (2002).  It does not, however, eliminate all pleading requirements.

[10]

First, the complaint must address all the elements that must be shown in order to support recovery under one or more causes of action.  "At a minimum, notice pleading requires that a complaint contain inferential allegations from which we can identify each of the material elements necessary to sustain a recovery under some viable legal theory." *Wilchombe v. TeeVee Toons, Inc*., 555 F.3d 949, 960 (11th Cir. 2009) (emphasis and internal quotes omitted).

Pleading elements is necessary, but it is not enough to satisfy Rule 8(a)(2).  The rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" to satisfy that rule.  *Twombly*, 550 U.S. at 555. There must in addition be a pleading of facts.  Though they need not be detailed, "[f]actual allegations must be enough to raise a right to relief above the speculative level ...."  *Id*.  That is, the complaint must allege "enough facts to state a claim for relief that is plausible on its face."  *Id*. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard … asks for more than a sheer possibility that the defendant has acted unlawfully," and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id*. (internal quotes omitted).  A complaint lacking "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" will not "survive a motion to dismiss."  *Id*.  But so long as the plausibility standard is met, the complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotes omitted).

The DHR defendants, along with Russell, invoke these principles.  (Doc. 40 at 9-10; Doc. 47 at 2-6).

The Court bemoaned the original complaint's lack of "[a]n introductory set of numbered paragraphs briefly setting forth – preferably in chronological order – the key

facts and events that form the basis of the complaint." (Doc. 20 at 2). The plaintiff nevertheless ignored the Court's instruction that the amended complaint should "provide at the outset no more than a few dozen brief numbered paragraphs setting forth in a coherent, organized fashion the most important facts underlying the plaintiff's claims." (Doc. 20 at 4 (emphasis omitted)).[9] Instead, he has stubbornly insisted on continuing to randomly sprinkle factual and quasi-factual allegations throughout his amended complaint. The following numbered paragraphs collect and organize these isolated allegations.[10]

---

[9] The plaintiff likewise ignored the Court's admonition in its order dismissing *Muhammad I* that, should he file a new lawsuit, he should "clearly allege in brief numbered paragraphs necessary facts as to what each defendant did." (Doc. 35, Attachment 3).

[10] The amended complaint purports to "reference … the original of this amended complaint and whatever evidence that can be gleaned from 'Muhammad 1.'" (Doc. 37 at 24; *accord id*. at 21, 23, 25-28). That is, the plaintiff purports to incorporate into his amended complaint the 100-page original complaint that has already been ruled legally improper, *plus* untold pages of "evidence" found not in this lawsuit but in its predecessor. This is legally impermissible.

"A statement in a pleading may be adopted by reference elsewhere … in any other pleading or motion." Fed. R. Civ. P. 10(c). Note that the rule allows "statements" to be adopted, not "pleadings." Courts have routinely required that a pleading invoking incorporation by reference "must specifically identify which portions of the prior pleading are adopted therein." *Lowden v. William M. Mercer, Inc*., 903 F. Supp. 212, 216 (D. Mass. 1995) (internal quotes omitted); *accord Kolling v. American Power Conversion Corp*., 347 F.3d 11, 17 (1st Cir. 2003); *Shelter Mutual Insurance Co. v. Public Water Supply District No. 7*, 747 F.2d 1195, 1198 (8th Cir. 1984); *Nycomed, Inc. v. Glenmark Generics Ltd*., 2010 WL 1257803 at *4 (E.D.N.Y. 2010); *Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 447-48 (E.D. Va. 2009); *In re: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*, 2007 WL 1202544 at *2 n.1 (N.D. Ill. 2007); *Wolfe v. Charter Forest Behavioral Health Systems, Inc*., 185 F.R.D. 225, 230 (W.D. La. 1999). The plaintiff's sweeping reference to his 100-page complaint represents precisely the "boiler plate 'safety valve,'" *id*., that other courts – and this one – condemn. *See Park City Water Authority v. North Fork Apartments, L.P*., 2010 WL 5463814 at *4 n.10 (S.D. Ala. 2010).

The plaintiff's attempt to reference material from *Muhammad I* is likewise foreclosed. *Texas Water Supply Co. v. Reconstruction Finance Corp*., 204 F.2d 190, 196-97 (5th Cir. 1953) ("Rule 10(c) … permits references to pleadings and exhibits in the same case, but there is no rule permitting the adoption of a cross-claim in a separate action in a different court by mere (Continued)

1.   The plaintiff had a daughter by Bethel.  In or before 2009, the plaintiff and Bethel entered an agreement calling for "arbitration in a specific forum of religious elders."[11]  The agreement still holds sway because it contains elements of a private trust and the daughter is legal heir to the agreement.  In or about 2009, Bethel nevertheless filed a custody action and later a child support action in state court.  Russell served as her counsel, and Armstrong was the presiding judge.  (Doc. 37 at 8, 13, 17, 22).

2.   In or about April 2010, state agents burst in upon the plaintiff's children at school and questioned them at the instigation of Bethel.  (Doc. 37 at 5, 12).

3.   Hatcher is a DHR employee and assisted Bethel in connection with the two lawsuits, even though she had read the agreement and knew that it prevented resort to the judicial system.  Hatcher is Bethel's first or second cousin, and this created a conflict of interest, but Hatcher agreed with Bethel to proceed in order to help her relative, concealing her conflict in the process.  Bethel and Hatcher agreed not to tell Judge Armstrong about the agreement.  The plaintiff notified Hatcher and various DHR representatives of the agreement and that it precluded the lawsuits, but the DHR defendants persisted.  The DHR defendants are also aware of Hatcher's conflict of

---

reference."); *accord Constellation Energy Commodities Group Inc. v. Transfield ER Capt Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action."); *Hall v. Tyco International Ltd.*, 223 F.R.D. 219, 261 (M.D.N.C. 2004).  The plaintiff's position is even less tenable, since he purports to reference, not the pleadings in *Muhammad I*, but unidentified "evidence" he submitted therein, and Rule 10(c) permits adoption by reference only of pleadings, not of evidence.

In short, the viability of the plaintiff's action is to be measured by his amended complaint, not by the avalanche of other filings with which he has inexcusably flooded the Court and the litigants over the course of two lawsuits.

[11] The plaintiff, citing his asserted privacy rights, has not submitted the agreement.  (Doc. 37 at 11).

interest.  The DHR defendants acted to protect themselves, due to Hatcher's conflict of interest and fraud.  (Doc. 37 at 8-9, 11-13 19, 22-23).

4.  Russell knew of the arbitration provision because Bethel gave him the agreement, but he concealed the matter of the contract.  In the spring of 2010, Russell engaged in an ex parte conversation with Judge Armstrong.  On or about January 5, 2011, he engaged in another.  (Doc. 37 at 6-7, 12, 23).

5.  Judge Armstrong was made aware of the agreement by the plaintiff, who argued to him on many occasions that the contract precluded his jurisdiction.  However, Judge Armstrong never gave the plaintiff an audience to hear his challenge based on the arbitration agreement, and he never explained how he could exercise jurisdiction in the face of this agreement.  He also failed to make expeditious rulings on the plaintiff's motions asserting violations of his constitutional rights.  Judge Armstrong failed to ensure the making of a true and adequate record (by using a stenographer or making a digital recording).   He also failed to give the plaintiff voice for appeal of any of his decisions.  (Doc. 37 at 6, 12-13, 18-19, 22).

6.  The plaintiff told Hatcher, Russell, Judge Armstrong, and the DHR entities that the agreement was a private matter of religious consequence.   Armstrong was biased against the plaintiff on racial and religious grounds.  (Doc. 37 at 5, 8, 14, 20).

7.  Judge Armstrong was aware he had been sued in *Muhammad I*[12] and thereafter persecuted the plaintiff.   He tried to ensure that the plaintiff be guided into state court, despite his federal claims, knowing he had the best opportunity to kill any legal assertion. He concealed and tampered with evidence because the plaintiff had sued him in *Muhammad I*.  He presided at a hearing in January 2011 in order to make sure the plaintiff was punished for bringing him under federal scrutiny.  (Doc. 37 at 13-14, 22-23).

---

[12] The Court takes judicial notice that *Muhammad I* was filed on February 22, 2010.

8. After *Muhammad I* was filed, the plaintiff asked Judge Armstrong to recuse himself. Judge Armstrong later started making threats to pay sums of money, which the plaintiff contested based on his agreement with Bethel. (Doc. 37 at 18-19).

9. Bethel claimed the plaintiff owed her thousands of dollars in "back pay," which the plaintiff protested. This and/or other demands for payment were adverse to the terms of the private agreement. Russell, Hatcher and Judge Armstrong did not try to prevent Bethel from making this claim. The plaintiff announced he had audio and video evidence to refute Bethel's claim, but Judge Armstrong fought the plaintiff's efforts to bring this evidence to light. (Doc. 37 at 5, 17-18).

10. On and prior to January 5, 2011, the plaintiff objected to Judge Armstrong placing custody of the daughter with Bethel. The plaintiff noted that he already had two minor daughters in his household. Judge Armstrong commented that the plaintiff had enough children already and another might be too much. (Doc. 37 at 18, 23-24).

11. A hearing was set for January 5, 2011. The plaintiff filed a motion for continuance, but it was not ruled on. On or about the same date, Russell engaged in a second ex parte conversation with Judge Armstrong. At the hearing, Judge Armstrong took away the plaintiff's custody rights and sent out an arrest warrant for the plaintiff. Bethel, Hatcher and Russell agreed to this action. This was the conclusion of a plan by the non-Credit defendants to punish the plaintiff for bringing *Muhammad I*. (Doc. 37 at 6-7, 16, 19).

12. Judge Armstrong had recused himself but came back to preside at the January 2011 hearing and then recused himself again days later, never explaining why he was again sitting on the case. (Doc. 37 at 6, 7, 13, 19, 21).

13. The plaintiff was detained at some point under a false emergency of Bethel and Russell. He was later held on grounds of child support, which was spurious in light of the arbitration agreement. (Doc. 37 at 17).

14. Since approximately early 2011, the plaintiff has been bombarded with threat letters asking for payments the plaintiff believes he does not owe the state or Bethel.

Since approximately early 2010, the plaintiff has been subjected to countless summonses and threats of imprisonment by the state court.  At some point, Hatcher ushered the plaintiff before Judge Armstrong, under threat of jail for contempt, to sign documents for change of custody status and child support.  (Doc. 37 at 5, 15).

15.  The plaintiff was previously in fear of being thrown in jail.  Now, the DHR defendants collect private documents, have the plaintiff report to them, and come to the plaintiff's home under court order to validate that he and his daughters have a decent house in which to live.  (Doc. 37 at 15).

16.  The Credit defendants disseminated erroneous information received from the state defendants and/or court records.  In or about July 2011, the plaintiff sent the Credit defendants cease-and-desist letters and warned them that they were negligent in failing to clean up fraudulent information in his file received from the state and/or court records.  The Credit defendants had been previously warned that the information was fraudulent and had been told that Trans Union had eliminated the adverse data after learning the matter was in dispute in federal court for fraudulent attachments.   The plaintiff provided the Credit defendants with federal court documents.  The Credit defendants did not cease and desist.  The Credit defendants were actively and passively involved in the fraud concerning Bethel's back pay claim.  They lacked the will to clear the plaintiff's name of fraudulent attachment.  As a result of the Credit defendants' conduct, the plaintiff has experienced difficulty securing business and personal loans and has lost business.  (Doc. 37 at 10, 14, 18, 22, 28).

17.  In August or September 2011, the plaintiff showed up at a hearing in state court to vent his constitutional claims, but the DHR defendants' lawyer made clear they were not going to show up.  These defendants have repeatedly refused to state their position on the constitutional issues.  (Doc. 37 at 9).

18.  In or about November 2011, Russell saw the plaintiff in court and gave him a blood-curdling stare.  In or about November 2011, Russell recanted his legal representation of Bethel.  (Doc. 37 at 11, 12, 19).

[16]

19.  Judge Pettway has been appointed to take Judge Armstrong's place.  She conducted a hearing on February 2, 2012.  (Doc. 37 at 5, 9).

20.  The plaintiff believes that the defendants conspired.   The initial basis of the conspiracy was that Bethel and Hatcher are cousins.  The conspiracy is evidenced at least by Russell's two ex parte conversations with Judge Armstrong.  (Doc. 37 at 6-7, 17).

21.  The individual defendants had the ability to abort violations of the plaintiff's rights but lacked the will to do so.  They acted based on nepotism, family and friendly alliances, and religious hegemony.  (Doc. 37 at 21).

22.  All the defendants have attacked the plaintiff's property rights and personal financial accounts and creditworthiness by taking property from various accounts.  Damages include loss of custody, impairment of contract, attachment of wages, attachment of accounts, credit downgrade, loss of capital, loss of business, and emotional distress.  None of the defendants have apologized for their behaviors.  (Doc. 37 at 12-13, 19, 22).


Russell's skeletal argument – the only one his motion to dismiss advances – depends on a single explicit premise:  that the amended complaint "contains no facts whatsoever."  (Doc. 47 at 4).  This is patently incorrect, as the preceding 22 paragraphs make plain.  In order to obtain dismissal on this ground, Russell would need to compare the allegations against him to the legal requirements of each cause of action alleged against him and show that the facts alleged do not state a claim for relief that is plausible on its face.  Perhaps he could do so, but he has not made the effort, and the Court will not do battle on his behalf.

The DHR defendants' laconic presentation fares no better.  It likewise depends on the false premise that the amended complaint "does not describe specific actions taken by Defendants that violated his constitutional rights."  (Doc. 40 at 9).  As with Russell, it may be that the DHR defendants could mount an effective *Twombly-Iqbal* challenge, but simply positing the conclusion – based on an inaccurate denial that any facts are alleged

[17]

and without engaging in the work of identifying the factual allegations and comparing them separately to the legal requirements of each cause of action alleged against them – will not succeed.

### D.  Qualified Immunity.

Hatcher in her individual capacity asserts the defense of qualified immunity. (Doc. 40 at 11-16). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of the plaintiff's rights; and (2) whether these rights were clearly established at the time of the alleged deprivation.  *Id.*

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law."  *Harbert International*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application."  *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of

[18]

his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted). That is, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).[13]

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id.*

"[A] public official must first *prove* that he was acting with the scope of his discretionary authority when the allegedly wrongful acts occurred." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (emphasis added, internal quotes omitted). "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (internal quotes omitted). The Court must "interpre[t] the evidence in the light most favorable to the

---

[13] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Harbert*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

plaintiff." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).  The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority.  *Id.* (internal quotes omitted).  Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof.  *Id.* (internal quotes omitted).

Hatcher does not address in any fashion this critical first element of the qualified immunity analysis.  It is true that, in some cases, the very nature of the job will make it obvious that the defendant acted within her discretionary authority.  *See, e.g., Adams v. St. Lucie County Sheriff's Department*, 962 F.2d 1563, 1568 (11th Cir. 1992) ("It is axiomatic that a law enforcement officer has the discretionary authority to pursue and apprehend a fleeing suspected offender."), *vacated on other grounds*, 982 F.2d 472 (11th Cir. 1993).  Such clarity obviating further proof is rare, however, and in any event Hatcher does not provide even her job title.  For all the Court can tell, she is an administrative assistant operating miles beyond her job description and exercising powers that not even upper-echelon employees possess.  The Court cannot and will not compensate for Hatcher's failure by ignoring it or assuming the existence of unproved facts that might satisfy the standard for discretionary authority.  *See, e.g., Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1079 (S.D. Ala. 2009) ("Chief Collier has offered neither evidence nor argument on this point [discretionary authority], and the Court will not 'fill in the blanks' by formulating his arguments or presenting his proof for him as to this affirmative defense.").

### E.  Res Judicata/Collateral Estoppel.

[20]

The DHR defendants assert cursorily that suit is barred by doctrines of res judicata and collateral estoppel.  (Doc. 40 at 21).  Their one-paragraph treatment of this fairly complex issue is too superficial to allow its consideration.  The Court notes, however, that the doctrines as presented by the DHR defendants require the existence of a judgment and, as discussed in Part B, they have not shown that any such judgment exists.

### F.  Statute of Limitations.

The DHR defendants "believe that some if not all claims are barred by the two year statute of limitations based upon the dates provided."  (Doc. 40 at 22).  In the first place, the two-year period on which they rely is that applicable to actions under Section 1983 and, as noted in Part A, the DHR defendants have not shown that the plaintiff's statutory claims are brought under Section 1983.  Second, this lawsuit was filed on December 6, 2011, and the DHR defendants do not point to a single cause of action as to which the allegedly wrongful conduct occurred exclusively before December 6, 2009.

### CONCLUSION

For the reasons set forth above, the DHR defendants' motion to dismiss is **granted in part**.  Counts Two, Three, Twelve and Twenty-Three as to State DHR and Dallas DHR are **dismissed** pursuant to the Eleventh Amendment.  Counts One, Four, Eighteen, Nineteen, Twenty and Twenty-Two as to State DHR and Dallas DHR, to the extent brought pursuant to Section 1983 rather than pursuant to the other provisions referenced therein, are **dismissed** pursuant to the Eleventh Amendment.  The same counts and portions of counts, to the extent asserted against Hatcher in her official capacity for the purpose of obtaining an award of damages rather than injunctive relief, are **dismissed** pursuant to the Eleventh Amendment.  In all other respects, the DHR defendants' motion to dismiss is **denied**.

For the reasons set forth above, Russell's motion to dismiss is **denied** in its entirety.

[21]

DONE and ORDERED this 21st day of May, 2012.


s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE